IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

TIFFANY F.,
on behalf of A.M.F.,

        Plaintiff,

   v.                                  Civil Action 1:23-cv-174
                                      Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## OPINION AND ORDER

Plaintiff Tiffany F., acting on behalf of minor A.M.F., brings this action under 42 U.S.C. § 405(g), seeking review of the denial of A.M.F.'s application for Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff is A.M.F.'s mother and legal guardian. On May 10, 2021, she filed an application for SSI on A.M.F.'s behalf, alleging that she was disabled that same day. (R. at 14, 232). After her application was denied initially and upon reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on May 4, 2022. (R. at 123–37). On June 13, 2022, the ALJ issued a decision denying Plaintiff's application for benefits. (R. at 11–31). When the Appeals Council denied Plaintiff's request for review, the ALJ's ruling became the Commissioner's final decision. (R. at 1–7).

Plaintiff filed this action *pro se*, seeking a review of the Commissioner's decision (Doc. 1). As the Court required, the Commissioner filed the administrative record, and the matter has been briefed and is ripe for consideration (Docs. 9, 10, 13).

### A. Personal Background

A.M.F. was born in 2014. At the time of the ALJ's decision, she was a school-age child. (R. at 15).

### B. Relevant Hearing Testimony and Statements to the Agency

The ALJ summarized A.M.F.'s mother's testimony and statements to the agency as follows:

> Initially, [A.M.F.] alleged disability due to ADD and dyslexia (2E/1-2). The claimant's mother also reported she has trouble seeing and uses glasses (4E/4). She stated that [A.M.F.]'s ability to progress in learning was limiting. In May 2021 ([A.M.F.] was 7 years old at the time), she stated [A.M.F.] was unable to read, write, spell, add/subtract, understand money, or tell time (4E/7). [A.M.F.]'s mother reported she has no physical limitations (4E/8). She also stated her impairments do not affect her behavior with other people (4E/9). [A.M.F.]'s mother further reported no issues with her ability to take care of personal needs. She stated [A.M.F.] has limitations in paying attention and was unable to complete homework or chores (4E/11).
>
> At the hearing, [A.M.F.]'s mother testified that [A.M.F.] has medication management with the Children's Home and sees a speech therapist with Cincinnati Children's Hospital. She said [A.M.F.] take Adderall twice a day. She added that she did not see much benefit from the medication but she did not want to up her dosage. She noted no medication side effects. [A.M.F.]'s mother stated she was homeschooled but may need her medication increased once she returns to in-person school.
>
> [A.M.F.]'s mother reported that [A.M.F.] needs frequent, detailed reminders for completing tasks, chores, and self-care. She said she has no difficulties with physical activities. [A.M.F.]'s mother testified that [A.M.F.] recently had an IEP finalized. She said [A.M.F.] does not know how to read or write. She added she can write her name, but it is upside down and backwards. [A.M.F.]'s mother further testified that [A.M.F.] sees a speech therapist but she did not really think she had a speech or language issue. She also stated that [A.M.F.] gets along with her and other family members at times, but she also has lots of outbursts.
>
> [A.M.F.]'s mother testified that [A.M.F.] does digital learning but will close her laptop when asked a question that she does not know the answer to. She also reported that claimant has trouble following rules. She stated [A.M.F.] has significant problems paying attention and completing schoolwork, adding that she has to walk her step-by-step through it (testimony).

(R. at 19–20).

### C.     Relevant Medical Evidence

The ALJ summarized A.M.F.'s medical records as follows:

In April 2021, [A.M.F.] had an initial visit with The Children's Home. Her mother reported [A.M.F.] could not focus during school or at home. She was also concerned about [A.M.F.] reading and writing backwards (2F/4). On exam, [A.M.F.] had problems answering questions. When asked how she was doing, she answered "7." She had a normal mood and affect and was cooperative. Her memory was intact though she was easily distracted (2F/5). She was then started on Adderall (2F/6).

In May, [A.M.F.]'s attention was noted as improved with medication. She was calmer and more focused. She was still not at grade level with reading. Her mother noted her outbursts were minimal and she was offering to help with extra chores (2F/8). On exam, she was alert, cooperative, and attentive. Her memory was intact (2F/9).

During a vision exam in June 2021, [A.M.F.] had glasses but had broken them months before. She reported having a hard time in school because she did not have glasses. Her prescription was updated, and she was advised to wear them full time (6F/3).

In July 2021, [A.M.F.]'s mother reported her medication wore off in the afternoon, causing afternoon inattention. She requested short acting afternoon dose of Adderall (3F/3). During the exam, [A.M.F.] had poor speech articulation but did not display problems expressing herself or with comprehension. She had a normal mood and affect and was cooperative. She was attentive and her memory was intact (3F/4). She was started on a trial of afternoon Adderall and was continued on melatonin (3F/5).

In early August, physical exam findings were normal, aside for dental carries. She was cleared for dental surgery (4F/10). On August 10, 2021, [A.M.F.] had a dental procedure for alveolar abscess and dental decay (7F/6). She then developed a rash after the procedure, which was treated with prednisone and antibiotics (4F/6-7).

In August 2021, [A.M.F.]'s mother reported [A.M.F.]'s focus and attention had worsened even with morning and afternoon Adderall. She said there were no significant outbursts "other than normal 7-year-old behavior" (3F/7). During the exam, [A.M.F.] had poor speech articulation but did not display problems expressing herself or with comprehension. She had a normal mood and affect and was cooperative. However, she was easily distracted (3F/8). Her Adderall dose was then increased (3F/9).

3

The next month, [A.M.F.]'s mother reported she had a decreased appetite at lunch. She said her attention, focus, and behavior had improved (3F/11). [A.M.F.] was cooperative and attentive, with normal speech, mood, and affect (3F/12).

On October 21, 2021, [A.M.F.] presented for a developmental and educational evaluation in the Reading and Literacy Discovery Center due to concerns for dyslexia, reading below grade- level and writing/spelling below grade-level. [A.M.F.] demonstrated below average skills with tasks measuring language, executive control, attention, and cognitive problem-solving abilities. She demonstrated a differentiated cognitive profile that would be expected to contribute to grade-level difficulties and academic frustration (5F/2).

During the evaluation, [A.M.F.] was cooperative and pleasant, but became fidgety and impulsive at times, often requiring curing to sustain active listening posture. She would also make frequent off-topic comments and her performance was characterized by fluctuating attention (5F/4). As for speech intelligibility in both known and unknown contexts was noted to be intelligible although noticeably different (5F/5).

The examiner noted that weak processing speed may cause [A.M.F.] to take longer and put forth more effort to perform academic or everyday tasks and cause difficulties following multi-step instructions (5F/6). [A.M.F.] identified 16 letters in isolation but did not recognize any words or display phonemic awareness. She frequently wrote letters backwards. When asked to write her name, she wrote right to left backwards for all letters (5F/6).

On the Woodcock-Johnson IV Tests of Cognitive Abilities, [A.M.F.] scored in the very low range with brief intellectual ability and oral vocabulary. She scored in the low range with short-term working memory, cognitive processing speed, and cognitive efficiency (5F/12). She scored in the below average range of the Test of Nonverbal Intelligence-4 (5F/12). Her basic reading skills, phoneme-grapheme knowledge, and written language were very low, as measured by the Woodcock-Jonson IV Tests of Achievement (5F/13).

During a December 2021 medication management follow-up, [A.M.F.]'s mother said she was doing well at home behaviorally but had trouble with online school (11F/20). [A.M.F.] was cooperative but easily distracted. Insight and judgment were poor. She also had speech and language deficiencies (11F/21).

In January 2022, [A.M.F.] had an evaluation for speech language disorder. Her prognosis was good, and therapy was recommended twice a week for 3 months (8F/3). During a visit with Best Point that month, [A.M.F.] had poor articulation and problems expressing herself. However, she had a normal mood and affect, and was cooperative and attentive. Insight and judgment were average (11F/12).

In February 2022, [A.M.F.]'s mother reported [A.M.F.] was still very easily distracted and was unable to listen to an audiobook even while on medication. She said her mood and behavior was okay (11F/6). Exam findings included poor articulation and problems expressing herself. She was easily distracted and unable to sit still (11F/7). Her Adderall was then increased (11F/8).

In February and March 2022, [A.M.F.] was in a positive mood with a congruent affect during a telephone session with Best Point Education and Behavioral Health (11F/2-5). It was noted [A.M.F.]'s outbursts and tantrums had reduced, her attention had improved, and she was motivated to complete schoolwork (12F/5). Speech/language issues remained, but [A.M.F.] had a normal mood and was attentive (12F/6).

A March 2022 Evaluation Team Report noted that [A.M.F.] was scheduled to begin working in November 2021 with the Intervention Specialist on letter and sound recognition and math facts; however, her attendance was very sporadic, and when she attended class, she would log off when called upon. [A.M.F.] started attending sessions more regularly after winter break (at least once per week). On a curriculum-based measure given in January 2022, she identified 19/26 capital letters, 12/26 lower case letter and 4 sounds. She could not decode any of the CVC words presented. Other academic weaknesses noted were printing/handwriting. [A.M.F.] seemed to struggle with visual perception as she had difficulty with aligning numbers to complete math equations. A follow up measure was given in March 2022 and [A.M.F.] received the following: Upper Case letter recognition 13 consistently, Lower Case letter recognition, 8 consistently. Her attendance continued to be sporadic which greatly impacted her progress (13F/4).

[A.M.F.] was administered the Wechsler Intelligence Scale for Children - Fifth Edition (WISC-V) on April 5, 2022. She obtained a Full Scale IQ of 69, falling within the low range (13F/11).

On May 10, 2022, [A.M.F.] was given the Clinical Evaluation of Language Fundamentals (CELF-5) to formally assess her language skills. She obtained a Below Average score in all areas (13F/7). An informal articulation screener was used to assess [A.M.F.]'s ability to produce speech sounds at the word level. She made 5 errors which placed her around the 5 years old for speech development (13F/7). [A.M.F.] was pleasant and attentive during the 1-hour testing session. She easily established a rapport with this evaluator. She was talkative and answered questions on topic during "small talk" prior to testing and between administration of subtests. [A.M.F.] appeared to put forth best effort on all tasks presented to her. It was observed that she had some impulsive tendencies when responding to questions. She was uncertain at times when she provided an answer and sometimes said aloud "Did I get that wrong?" but she continued to attend to testing items with a little redirection but with prompts to ask, "Are you ready?" She fidgeted a lot in her seat and initiated her own movement breaks between subtests (13F/8). It was noted [A.M.F.] may benefit from direct small group instruction,

5

> repetition/paraphrasing information presented orally, and repeated practice of newly learned skills (13F/8).

(R. at 20–23).

### D. Relevant Educational Records

The ALJ also summarized A.M.F.'s educational records:

> In October 2021, [A.M.F.]'s school sent a note due to [A.M.F.] missing 150 hours of school (11E/12). In February 2022, [A.M.F.] was declared "habitually absent" under Ohio law (11E/13). In April, [A.M.F.]'s parents were referred to court due to excessive absences (10E/6). School records note she had failing grades in all classes (11E/4).

(R. at 23).

### E. The ALJ's Decision

The ALJ first found that A.M.F. was a school-age child on May 10, 2021, the date the application was filed. (R. at 15). Next, she found that A.M.F. had not engaged in substantial gainful activity since her application date. (*Id.*). At the next step of the sequential evaluation process, the ALJ concluded that A.M.F. had severe impairments, including attention deficit hyperactivity disorder ("ADHD"), intellectual disability, and mixed receptive-expressive language disorder. (*Id.*). She also found that A.M.F.'s impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments, or functionally equal those requirements. (*Id.*).

The ALJ highlighted that no mental listing in sections 112.00 or 12.00 was satisfied. Specifically, A.M.F. did not satisfy the requirements of listing 112.05, for intellectual disorders, listing 112.08, concerning personality and impulse control disorders, or listing 112.11 for neurodevelopment disorders. This was so, said the ALJ, because A.M.F. does not have an extreme

6

limitation in one area, or marked limitations in two areas, of the following:

      1. Understand, remember, or apply information
      2. Interact with others
      3. Concentrate, persist, or maintain pace
      4. Adapt or manage oneself

(R. at 16).

The ALJ determined that in the six domains of functioning that are pertinent to a child's benefits application, A.M.F. had no limitations in moving about and manipulating objects, or in health and physical well-being. A.M.F. was found to have less than marked limitations in attending and completing tasks, in interacting and relating with others, and in caring for herself. A.M.F. was found to have a marked limitation in acquiring and using information. (R. at 18–19, 23–25). Because a finding of one "extreme" limitation or two "marked" limitations is needed to support an award of benefits, the ALJ denied Plaintiff's claim. (R. at 26).

## II.    STANDARD OF REVIEW

To qualify for SSI as a child under the age of 18, a plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility depends upon disability, income, and other financial resources. *Id.* An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations provide a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

    1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

> 2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.
>
> 3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)? If so, benefits are granted.

20 C.F.R. § 416.924(a)–(d).

The Sixth Circuit has summarized the regulations concerning a child's application for disability benefits as follows:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is [A.M.F.] working, (2) does [A.M.F.] have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, [A.M.F.] has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. § 416.926a (e)(2)(i).
>
> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416. 926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

In the context of that legal framework, the Court's review "is limited to determining

8

whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

While Plaintiff does not identify a specific error in the ALJ's decision, the relevant portions of her Statement of Errors focus on (1) Failure to consider A.M.F.'s oppositional defiance disorder ("ODD") or low vision impairments as possibly meeting or medically equaling the severity of one of the listed impairments in Appendix I of 20 C.F.R. pt. 404, subpt. P; and (2) Facts from the record pertaining to the ALJ's finding that A.M.F.'s impairments did not functionally equal the listings in 20 C.F.R. § 416.92a. (Doc. 10 at 7–11). The Commissioner responds that the ALJ followed the law and substantial evidence supports the decision.

Because Plaintiff is proceeding *pro se* and does not identify specific errors, the Court has reviewed carefully the ALJ's decision related to the identified issues to determine whether the ALJ's critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports the findings.

### A. New Evidence

At the onset, the Court notes that in her Statement of Errors, Plaintiff submitted some

9

evaluations and referred to others that were not part of the record before the ALJ. (Doc. 10 at 3–5, 7–8, 10). She refers to "what ha[s] changed since the last court date . . . what I (mother) thought changed as well." (*Id.* at 1). To the extent that Plaintiff relies upon "[e]vidence which was not a part of the record on which the Commissioner's final decision was based," it "may not be considered as part of the administrative record for purposes of judicial review." *Cocroft v. Colvin*, No. 2:13-CV-729, 2014 WL 2897006, at *2 (S.D. Ohio June 26, 2014) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Stevens v. Astrue*, 839 F. Supp. 2d 939, 951 (S.D. Ohio 2012)). Instead, "[j]udicial review is confined to the evidence that was available to the Commissioner." *Cocroft*, 2014 WL 2897006, at *2 (citing *Hollon ex rel. Hollon*, 447 F.3d at 487). Instead, "[e]vidence submitted in the first instance to the district court may only be considered in determining whether remand is appropriate pursuant to sentence six of 42 U.S.C. § 405(g)." *Cocroft*, 2014 WL 2897006, at *2 (citing *Stevens*, 839 F. Supp. 2d at 951). The party seeking remand has the burden to show that remand is appropriate. *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986). And a plaintiff must show "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g).

The requirements of sentence six of 42 U.S.C. § 405(g) are not met here. Plaintiff submitted documents including an updated school individualized education plan ("IEP") plan from March 2023 and a related planning form from May 2023. (Doc. 10 at 3–5). Plaintiff also refers to evaluations, dated February 2023 and May 2023, about A.M.F.'s vision. (Doc. 10 at 7–8, 10). But all this concerns A.M.F.'s impairments that are too late for Plaintiff's current application for SSI. The relevant period encompasses the time between Plaintiff's application date (May 10, 2021) and the ALJ unfavorable decision (June 22, 2022). (R. at 11, 14); *see* 20 C.F.R. § 416.330

("If there is an administrative law judge hearing decision, your application will remain in effect until the administrative law judge hearing decision is issued.").

While the evidence is new, in that it was created after the administrative proceedings, the evidence is not material since there is not a reasonable probability that the ALJ would have reached a different result. *See Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). This is because the new evidence reflects A.M.F.'s conditions as of the dates they were created, not during the relevant period. This evidence is more appropriately submitted with a new application for SSI. *See* 20 C.F.R. § 416.330 ("If you first meet all the requirements for eligibility after the period for which your application was in effect, you must file a new application for benefits. In this case, we can pay you benefits only from the first day of the month following the month that you meet all the requirements based on the new application."). As such, a remand under sentence six of 42 U.S.C. § 405(g) is not proper, and the Court will not consider the records or the merits of Plaintiff's related arguments in the remainder of this decision.

### B. Oppositional Defiance Disorder and Low Vision Impairments

The ALJ found at step two that A.M.F.'s severe impairments included attention deficit hyperactivity disorder, intellectual disability, and mixed receptive-expressive language disorder. But the ALJ also found that the impairments did not meet or equal in severity the criteria of a listed impairment, either individually or taken together. (R. at 15). Plaintiff specifically points out A.M.F.'s other diagnoses of ODD in May 2022 and low vision impairments in February 2023, which the ALJ omitted from her step two findings. (Doc. 10 at 7). The ALJ's determination has substantial support. And, even if it did not, any error is harmless.

Plaintiff testified at the disability hearing that A.M.F. was diagnosed with ODD, which the medical record supports. (R. at 127) (*see e.g.*, R. at 477). While the ALJ did not expressly discuss

11

the disorder by name, the ALJ evaluated other evidence in the record of A.M.F.'s behavior that support her conclusion that A.M.F.'s ODD was not a severe impairment. For example, the ALJ noted that A.M.F. was generally observed to be cooperative and her occasional outbursts seemed to improve with medication. (R. at 16) (citing R. at 133, 335, 340, 344, 368). The ALJ also observed that during IEP testing, A.M.F. "put forth best effort on all tasks presented to her." (R. at 17) (citing R. at 532). The ALJ highlighted that according to a medical report in March 2022, A.M.F.'s "outbursts and tantrums had reduced." (R. at 22) (citing R. at 518). Elsewhere in the opinion, the ALJ noted that Plaintiff testified that A.M.F. got along with her family, although she still had some outbursts. (R. at 20) (citing R. at 133). Taken together, these observations support the ALJ's conclusion that A.M.F.'s ODD caused no more than minimal functional limitations. Accordingly, the fact that the ALJ did not find A.M.F.'s ODD to be a severe impairment at step two was supported by substantial evidence.

The ALJ also addressed A.M.F.'s vision impairments. As previously noted, aspects of A.M.F.'s low vision impairments were diagnosed outside of the relevant period of her application for SSI, so Plaintiff's arguments related to this evidence are beyond the Court's review. (*See* Doc. 10 at 7–8). Still, the ALJ considered evidence in the record related to A.M.F.'s vision generally throughout the opinion. The ALJ took account of Plaintiff's report that A.M.F. had trouble seeing and wore glasses. (R. at 19) (citing R. at 242). The ALJ also considered a June 2021 medical report that evaluated A.M.F. as having alternating esotropia and bilateral hyperopia, highlighted that A.M.F. had difficulties in school because she broke her glasses, and noted that she received an updated prescription with instructions to wear her glasses all the time. (R. at 20) (citing R. at 383). This evidence did not show that A.M.F. continued to struggle with vision problems when she wore her glasses, supporting the ALJ's conclusion that her vision with corrective lenses caused

no more than minimal functional limitations.

More still, any classification error was harmless. The finding of at least one severe impairment at step two is merely a threshold inquiry, the satisfaction of which prompts a full investigation into the limitations and restrictions imposed by all the individual's impairments. *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). "And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Id.* (quoting *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *accord Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *10 (S.D. Ohio Mar. 16, 2021) (finding no error despite ALJ's failure to designate plaintiff's neuropathy as a medically determinable or severe impairment where the ALJ discussed plaintiff's neuropathy and considered its impact on plaintiff's ability to work). Because the ALJ determined A.M.F. had other severe impairments, she continued with an analysis of all of the relevant evidence. (*See* R. at 15–26). As explained above, the ALJ specifically took evidence related to A.M.F.'s behavior and vision that supported the alleged impairments into account in her decision. Accordingly, even if the ALJ incorrectly classified A.M.F.'s ODD or vision impairments, there is no reversible error at step two.

**C.**     **Functional Equivalence**

Finally, the ALJ found that A.M.F. had a marked limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, a less than marked limitation in the ability to care for herself, and no limitation in health and physical wellbeing. (R. at 18–19). Taken together, these limitations do not functionally equal a listing because the ALJ did not find that A.M.F. had at least two "marked" limitations or at least one "extreme" limitation. (R. at 26). In making these determinations, the ALJ considered

Plaintiff's testimony at the disability hearing, relevant medical evidence, and A.M.F.'s education records. The ALJ supported each limitation finding with substantial evidence from the record.

First, the ALJ considered A.M.F.'s low range IQ test result, low range abilities for brief intellectual activity, oral vocabulary, cognitive processing speed, and cognitive efficiency, below average range ability for nonverbal intelligence, and very low achievement in reading skills, phoneme-grapheme knowledge, and written skills. (R. at 23–24) (citing R. at 371–372, 534–535). The ALJ also considered A.M.F.'s poor grades, though noted that it was unclear if the grades were due to her high number of school absences and uncompleted coursework. (R. at 24) (citing R. at 283–295, 312, 320–322, 528). Ultimately, the ALJ concluded that A.M.F.'s low test scores and poor grades showed that she had a marked limitation in acquiring and using information. As such, the ALJ's determination for this limitation was supported by substantial evidence.

Second, the ALJ noted Plaintiff's report that A.M.F. had "difficulties with attention and completing tasks" and was prescribed Adderall in April 2021. (R. at 24) (citing R. at 134, 330–332). The ALJ also considered reports that A.M.F. improved after being on Adderall for one month, and, during a medical exam, was alert, cooperative, attentive, and had an intact memory. (R. at 24) (citing R. at 334–335). The ALJ further noted a medical report in August 2021 which stated that Plaintiff said the Adderall was becoming less effective; yet, during the medical exam, A.M.F. was again cooperative with a normal mood and affect, albeit easily distracted. (R. at 24) (citing R. at 343–344). The ALJ considered subsequent evaluations when A.M.F. was, at times, cooperative and attentive with normal speech, mood, and affect; and, at other times, was fidgety and impulsive with below average skills in attention. (R. at 24) (citing R. at 347–348, 370–371). The ALJ also considered that in September 2021, Plaintiff reported that A.M.F.'s attention, focus, and behavior had improved. (R. at 24) (citing R. at 347). The ALJ considered that in March 2022

an examination also noted that A.M.F.'s attentiveness had improved. (R. at 24) (citing R. at 518–519). The ALJ highlighted that during an IEP evaluation in May 2022, A.M.F. "appeared to put forth best efforts on all tasks presented to her . . . that she had some impulsive tendencies [and] [s]he fidgeted a lot in her seat and initiated her own movement breaks between subtests." (R. at 24) (citing R. at 532). The ALJ balanced these reports and objective evaluations, particularly highlighting that A.M.F. was "noted as attentive on many occasions," to conclude that she had a less than marked limitation in attending and completing tasks. (R. at 24). As such, the ALJ's determination for this limitation was supported by substantial evidence.

Third, the ALJ considered reports that A.M.F.'s occasional outbursts seemed to improve with medication and that she was cooperative. (R. at 25) (citing R. at 133, 335, 340, 344, 368). The ALJ noted that A.M.F. attended speech and language therapy, scored below average in fundamental language skills, and tested around a five-year-old's level for speech development in May 2022. (R. at 25) (citing R. at 422, 531). The ALJ also highlighted that during one clinical appointment in January 2022, even though A.M.F. had poor articulation and self-expression, A.M.F. still had a normal mood and affect, was cooperative and attentive, and showed average insight and judgment. (R. at 25) (citing R. at 481). The ALJ concluded that based on reports of A.M.F.'s "cooperative and pleasant presentation, combined with her communication / speech difficulties[,]" she had a less than marked limitation in interacting and relating with others. (R. at 25). As such, the ALJ's determination for this limitation was supported by substantial evidence.

Fourth, the ALJ considered that Plaintiff reported that A.M.F. did not have issues taking care of her personal needs. (R. at 25) (citing R. at 248). The ALJ considered that Plaintiff reported that A.M.F. had limitations in paying attention and was not able to complete housework or chores. (R. at 25) (citing R. at 249). The ALJ also highlighted that A.M.F.'s insight and judgment had

15

been rated as poor during a medical evaluation in December 2021, but in January 2022 those skills were rated as average. (R. at 25) (citing R. at 481, 490). The ALJ balanced Plaintiff's reports with the medical evaluations about A.M.F.'s insight and judgment to conclude that A.M.F. had a less than marked limitation in the ability to care for herself. (R. at 25). As such, the ALJ's determination for this limitation was supported by substantial evidence.

Fifth, the ALJ considered that Plaintiff did not report that A.M.F. had difficulties related to moving about or manipulating objects or that A.M.F. had other health or physical limitations. (R. at 25) (citing R. at 241–249). The ALJ further noted that although A.M.F. wore glasses, "physical exam findings noted only few, temporary abnormalities but were generally normal." (R. at 25) (citing R. at 358–362, 382–392). The ALJ concluded that the lack of reported difficulties and generally normal physical exam findings showed that A.M.F. had no limitation in moving about and manipulating objects and no limitation in health and physical wellbeing. As such, the ALJ's determination for this limitation was supported by substantial evidence.

In sum, the ALJ's critical findings of fact were made in compliance with the applicable law, and substantial evidence supports her non-disability conclusion.

## IV.   CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date:   October 26, 2023                          /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE